# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

JOHN D. O'HOLLERAN,

        Plaintiff,

vs.

IOWA PHYSICIANS CLINIC
MEDICAL FOUNDATION, d/b/a
Unity Point Clinic,

        Defendant.

No. C23-4056-LTS-MAR

**MEMORANDUM OPINION AND
ORDER ON DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT**

## I.     INTRODUCTION

This case is before me on a motion (Doc. 15) for summary judgment by defendant Iowa Physicians Clinic Medical Foundation d/b/a Unity Point Clinic (UPC). Plaintiff John O'Holleran has filed a resistance (Doc. 17) and UPC has filed a reply (Doc. 19). Oral argument is not necessary. *See* Local Rule 7(c).

## II.     PROCEDURAL HISTORY

O'Holleran commenced this action by filing a complaint and jury demand (Doc. 1) on October 12, 2023. The complaint includes claims for negligent misrepresentation (Count II) and breach of contract (Count III).[1] In its answer (Doc. 6), UPC asserts a counterclaim for breach of contract. Trial is scheduled to begin December 15, 2025.

---

[1] The complaint contains a section entitled "Count I," but that section merely recites the allegations common to all counts and does not state an independent legal claim. Doc. 1 at 1-2.

### III. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there

2

is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

## IV.     RELEVANT FACTS

Unless otherwise noted, the following facts are undisputed for purposes of UPC's motion:

UPC is a healthcare organization that employs physicians who work in markets and for hospitals affiliated with Iowa Health System d/b/a Unity Point Health (UPH). Doc. 15-2 at 1 ¶¶ 1, 2. UPH is a member of UPC. *Id.* ¶ 2. St. Luke's Regional Medical Center in Sioux City, Iowa (St. Luke's), is a UPH-affiliated hospital. *Id.* ¶ 3.

In early 2022, O'Holleran began seeking new employment while he was employed as a general surgeon at CGH Medical Center in Sterling, Illinois. *Id.* at 2 ¶ 5. In February 2022, O'Holleran began communicating with UPC regarding an open general surgeon position at St. Luke's. *Id.* ¶ 6. In March 2022, O'Holleran visited St. Luke's in person and interviewed for the general surgeon position. *Id.* ¶ 7. While visiting St.

3

Luke's, O'Holleran met with Jane Arnold, UPH's Senior Vice President of Business and Network Development, Dr. Jeremy Granger, a pediatrician employed by UPC, and Lorenzo Suter, who was UPH's Regional President and Chief Executive Officer. *Id.* ¶ 8. Following O'Holleran's interview, UPC offered him the general surgeon position at St. Luke's, which he accepted. *Id.* ¶¶ 9-10.

On April 22, 2022,[2] O'Holleran executed a physician's employment agreement (the Employment Agreement) with UPC. *Id.* at 2 ¶ 11. The Employment Agreement, which refers to UPC as the "Foundation," contained a clause protecting O'Holleran's independent medical judgment. Doc. 17-3 at 1 ¶ 2. Specifically, Section 3(h) is entitled "Medical Judgment" and reads as follows:

> Physician shall use his or her best professional judgment in determining when, how, where, and whether to render treatment to individual patients. Foundation shall not have, exercise, or attempt to exercise any control over the professional judgment and decision making of Physician. Physician is free to accept and treat patients according to his or her best medical judgment, or to transfer such patients for diagnosis or cure to other practitioners or facilities in accordance with the patient's best medical interest, so long as the action of Physician is not based upon a prohibited reason enumerated in Section 3(d) above. In the event that Physician reasonably believes that Foundation or any other entity is attempting to interfere with the exercise of independent medical judgment, Physician shall: (i) first notify a Regional Physician Leader and attempt to resolve the difference through intercession of a Regional Physician Leader; and (ii) thereafter raise the issue with the Regional Physician Leadership Council. The Regional Physician Leadership Council is authorized to investigate complaints by Physician and make findings and recommendations to the Regional Physician Leader within its area of responsibility.
>
> The foregoing shall not relieve Physician of the obligation to follow bylaws, rules and regulations, policies, and directives of Foundation, including policies and plans such as those dealing with utilization review, quality assessment and management, drug formulary, and appropriate utilization of

---

[2] O'Holleran's statement of facts states that the parties executed this contract on April 12, 2022. Doc. 17-3 at 1 ¶ 1. However, the contract makes it clear that it was executed on April 22, 2022. Doc. 1 at 14, 17.

space, staff, equipment, and supplies. Additionally, Physician is obligated to comply with Foundation's physician-approved, evidence-based patient care policies, standards, and protocols so long as these standards and protocols arc not contrary to Physician's professional judgment and the patient's best interests.

Doc. 15-2 at 3 ¶ 12. Section 4 is entitled "Responsibilities of Physician" and includes the following provision:

Throughout the term of employment hereunder, Physician commits to the following obligations:

a. Establish a medical practice in Physician's specialty, and maintain and conduct such practice at one or more sites as mutually agreed to;

*Id.* ¶ 13. Section 16 is entitled "Non-Disclosure" and states:

The terms of this Agreement shall be confidential between the parties. Subject to any exceptions in this Agreement, neither party shall disclose the terms of this Agreement, except as reasonably necessary to carry out the provisions of this Agreement, or as agreed to in writing by the other party.

*Id.* ¶ 16.

An attachment to the Employment Agreement contains a section entitled "Relocation Expenses," which states:

Foundation will reimburse Physician for reasonable and necessary relocation expenses not to exceed Ten Thousand Dollars ($10,000.00). Reimbursement is subject to appropriate documentation from Physician of such expenses and the policies of Foundation for type and amount of reimbursement. In the event that Physician fails to commence employment as set forth in the Agreement or ceases to be an employee of Foundation prior to the completion of two (2) years of employment for any reason other than death, permanent disability, or without cause termination of the Agreement by Foundation, Physician will be responsible for immediate repayment of all such relocation expenses.

*Id.* at 4 ¶ 14. The attachment also contains a section entitled "Signing Bonus," which states:

5

> Foundation will pay a signing bonus to Physician in the amount of Twenty Five Thousand Dollars ($25,000.00) upon satisfactory completion of necessary licensure, hospital, and insurance credentialing applications. In the event that Physician fails to commence employment as set forth in the Agreement or ceases to be an employee of Foundation prior to the completion of two (2) years of employment at or above the initial FTE status for any reason other than death, permanent disability, or without cause termination of the Agreement by Foundation, Physician will be responsible for immediate repayment of the total gross amount of the signing bonus.

*Id.* ¶ 15.

Following execution of the Employment Agreement, UPC paid O'Holleran the $25,000 signing bonus and $10,000 for relocation expenses. *Id.* at 5 ¶¶ 17, 18. O'Holleran began working for UPC on June 20, 2022. *Id.* ¶ 20. At all times during his employment with UPC, O'Holleran worked as a general surgeon at St. Luke's. *Id.* ¶ 19.

In July 2022, Dr. Stephen Pallone became UPC's Vice President Medical Director for the Sioux City Region. *Id.* ¶ 21. In that role, Pallone served as a Regional Physician Leader and was a member of the Regional Physician Leadership Council. *Id.* ¶¶ 22,23. The Regional Physician Leadership Council is authorized to investigate complaints by physicians regarding interference with their independent medical judgment. *Id.* ¶ 25.

O'Holleran contends that his independent medical judgment was compromised on multiple occasions. Doc. 17-3 at 1 ¶ 5; Doc. 17-2 at 15-20 (O'Holleran testifying about superiors interfering with his decisions to recommend elective surgeries rather than immediate operations, not to place dialysis catheters and to review CAT scans with patients). O'Holleran had discussions with various UPC administrators, including Arnold, Pallone, Granger and Lynn Brown, on 11 separate dates between July 21, 2022, and March 9, 2023, regarding O'Holleran's manner of practice. Doc. 17-3 at 1 ¶ 3. O'Holleran was placed on multiple Performance Improvement Plans (PIPs) throughout his employment, which he states were the last step before termination. Doc. 17-2 at 6-7.

On March 27, 2023, O'Holleran submitted a letter of resignation from his position at UPC. Doc. 15-2 at 5 ¶ 26. O'Holleran's final day of employment with UPC was July 25, 2023. *Id.* at 6 ¶ 27. As such, he was employed by UPC for less than two years. *Id.* ¶ 28. After resigning, O'Holleran refused to repay the signing bonus and relocation expenses pursuant to the Employment Agreement. *Id.* ¶¶ 29, 30.

O'Holleran's complaint and jury demand (Doc. 1) includes an unredacted copy of the entire Employment Agreement. *Id.* ¶ 32. He has not moved to seal the Employment Agreement. *Id.* ¶ 33.

## V. DISCUSSION

UPC seeks summary judgment on all of O'Holleran's claims, as well as on its counterclaim. I will address each claim in turn.

### A. O'Holleran's Negligent Misrepresentation Claim (Count II)

O'Holleran argues that UPC assured him throughout the recruitment process that his surgical duties would not include "advanced trauma, endoscopy, pediatrics, or vascular procedures." Doc. 1 at 2. O'Holleran states that, despite these assurances, he was criticized throughout his employment for failing to perform these procedures. *Id.* at 3. To prevail on a claim for negligent misrepresentation, O'Holleran must prove:

> (1) [T]he defendant was in the business or profession of supplying information to others; (2) the defendant intended to supply information to the plaintiff or knew that the recipient intended to supply it to the plaintiff; (3) the information was false; (4) the defendant knew or reasonably should have known that the information was false; (5) the plaintiff reasonably relied on the information in the transaction that the defendant intended the information to influence; (6) and the false information was the proximate cause of damage to the plaintiff.

*Boliver v. Kester,* 886 N.W.2d 107, 2016 WL 4384369, at *3 (Iowa Ct. App. 2016).

UPC argues that O'Holleran's negligent representation claim fails as a matter of law because O'Holleran "cannot show even the first element of negligent misrepresentation—that UPC 'was in the business or profession of supplying information to others....'" Doc. 15-1 at 5 (quoting *Boliver,* 2016 WL 4384369, at *3). As the Iowa Supreme Court has explained:

> When determining whether a person is in the business of supplying information to others, we consider several factors. We distinguish between relationships that are arm's-length and adversarial and those that are advisory. We also consider whether the person providing the information "is manifestly aware of the use that the information will be put, and intends to supply it for that purpose." We consider whether the defendant gave the information to the plaintiff "gratuitously or incidental to a different service." We have also found it appropriate to consider the role the defendant was playing when the alleged misrepresentation occurred.
>
> \*       \*       \*
>
> We have found accountants, appraisers, school guidance counselors and investment brokers all fall within this class of potential defendants. However, we have refused to allow a suit for negligent misrepresentation where the defendant was a retailer in the business of selling and servicing merchandise, a seller who made misrepresentations pursuant to the sale of a business, a bank officer negotiating a loan guarantee with a bank customer, *or an employer negotiating with an employee for employment*.

*Pitts v. Farm Bureau Life Ins. Co.,* 818 N.W.2d 91, 111-12 (Iowa 2012) (internal citations omitted) (emphasis added).

Another Iowa Supreme Court case helps further determine whether UPC was in the business of supplying information to O'Holleran during the recruitment process. In *Fry v. Mount,* 554 N.W.2d 263 (Iowa 1996), the plaintiff alleged that his employer made the following representations to him in a preemployment interview:

> a. [The defendants] represented that I had the knowledge and skill that would make me an integral part of the new operation;
>
> b. They represented to me that my skills would make me indispensable to their operation; and

8

c. They represented to me that I would have long-term employment
situation [sic] with their organization.

*Id.* at 264. Despite these representations, the plaintiff was fired within four months of
being hired. *Id.* The court found that a negligent misrepresentation claim was
inapplicable under these circumstances because:

> [The plaintiff] and [the employer] were dealing at arm's length. The
> relationship was 'adversarial' in nature, not advisory. Accordingly, [the
> employer] owed no duty to [the plaintiff] under this court's traditional
> interpretation of section 552. To rule otherwise would permit an at-will
> employee like [the plaintiff] to potentially recover in tort on the same factual
> grounds on which the law would deny him recovery in contract.

*Id.* at 266 (internal citations omitted). The Court later summarized its holding in *Fry* to
mean that "the tort of negligent misrepresentation has no application in an employment
relationship, where representations are made to 'sell' the company rather than to guide
the employee 'with professional advice.'" *Schoff v. Combined Ins. Co. of America,* 604
N.W.2d 43, 50 (Iowa 1999) (quoting *Fry,* 554 N.W.2d at 267).

O'Holleran argues that despite clear Iowa precedent holding that negligent
misrepresentation is inapplicable in an employment context, his claim "falls within the
exception to of the rule of the Iowa Supreme court refusing suits for negligent
representation under the employment situation." Doc. 17 at 1-2. In support, O'Holleran
argues that his negligent misrepresentation claim is distinguishable because he was
recruited, UPC provided him with advisory materials and "[o]nce in the fold and
working, representations made early on were no longer applicable." Doc. 17-1 at 4.
O'Holleran cites no authority for his contention that this situation falls into an exception
to the Iowa Supreme Court's clear rule regarding negligent misrepresentation claims in
the employer-employee context and cites no authority that such an exception even exists.

Far from falling within an exception to the rule that "the tort of negligent
misrepresentation has no application in an employment relationship," O'Holleran's

9

situation fits neatly into the Iowa Supreme Court's reasoning in *Fry*. *Schoff*, 604 N.W.2d at 50. Like the plaintiff in *Fry*, O'Holleran was induced to accept employment with UPC based on representations made during the recruitment process. The representations that O'Holleran would not be expected to perform certain procedures were made "to sell" UPC as an employer, "rather than to guide" O'Holleran "with professional advice." *Id*. These representations were thus "arms-length" and "adversarial in nature, not advisory." *Fry*, 554 N.W.2d at 266. As such, because UPC was not "in the business or profession of supplying information" to O'Holleran, his negligent misrepresentation claim fails as a matter of law. *Boliver*, 2016 WL 4384369 at *3. UPC is entitled to summary judgment on Count II.

**B.     O'Holleran's Breach of Contract Claim (Count III)**

O'Holleran argues that UPC contracted in the Employment Agreement that it would not exercise control over his professional judgment and decision making, yet UPC "consistently attempted to exercise control over the professional judgment of [O'Holleran]", thus breaching the Employment Agreement. Doc. 1 at 3. To prevail on his breach of contract claim, O'Holleran must prove:

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [he] has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that [he] has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.,* 578 N.W.2d 222, 224 (Iowa 1998).

UPC argues that Section 3(h) of the Employment Agreement contains mandatory dispute resolution procedures that O'Holleran failed to follow before filing suit. Doc. 15-1 at 8. Specifically, Section 3(h) of the Employment Agreement contains the following language:

> In the event that Physician reasonably believes that Foundation or any other entity is attempting to interfere with the exercise of independent medical judgment, Physician shall: (i) first notify a Regional Physician Leader and

10

attempt to resolve the difference through intercession of a Regional Physician Leader; and (ii) thereafter raise the issue with the Regional Physician Leadership Council. The Regional Physician Leadership Council is authorized to investigate complaints by Physician and make findings and recommendations to the Regional Physician Leader within its area of responsibility.

Doc. 15-2 at 3 ¶ 12. O'Holleran counters that UPC materially breached the Employment Agreement by interfering with his independent medical judgment and this material breach waived his obligation to follow the dispute resolution process outlined in the Employment Agreement. Doc. 17-1 at 6.

In support of its argument, UPC points to the Southern District of Iowa's statement that, "[t]he Iowa Supreme Court has recognized that when language in a provision of a contract requires certain prerequisites before filing suit, meeting those prerequisites is necessary before filing suit." *National Biodiesel Board v. Hull Partners, L.L.C.,* No. 4:19-cv-00279, 2019 WL 8376265, at *8 (S.D. Iowa 2019) (citing *Holliday v. Rain & Hail L.L.C.,* 690 N.W.2d 59, 66 (Iowa 2004)). UPC further argues that Section 3(h)'s inclusion of the word "shall" means the dispute resolution process laid out in that section is mandatory. Doc. 15-1 at 10. Indeed, "[a]s a general rule of statutory or contract construction, 'may' is permissive, whereas 'shall' is mandatory." *Thompson-Harbach v. USAA Federal Savings Bank,* 359 F. Supp. 3d 606, 630 (N.D. Iowa 2019) (citing *Anderson v. Yungkau,* 329 U.S. 482, 485 (1947), and *LeMay v. U.S. Postal Serv.,* 450 F.3d 797, 799 (8th Cir. 2006)).

UPC is correct that the two grievance steps in Section 3(h) are preceded by the word "shall" which indicates that the Employment Agreement contemplates these steps as mandatory in some regards. However, unlike the provision in *National Biodiesel,* Section 3(h) does not contemplate the possibility of litigation. As another court summarized in the context of a contractual mediation clause, "[w]hen courts have found that mediation is a condition precedent to initiating litigation, the parties' agreement has both (i) addressed the issue of filing a lawsuit, and (ii) specified that mediation must first

11

take place[.]" *Franke v. Yates,* No. 19-cv-00007, 2019 WL 4856002, at *6 (D. Hawaii Oct. 1, 2019). The court summarized other cases involving mandatory mediation clauses, as follows:

> In *Brosnan*, the mediation clause stated, in relevant part: "the Company and the Franchisee each agree to enter into mediation of all disputes involving this Agreement ... ***prior to initiating any legal action against the other.***" 2008 WL 2388392, at *1 (emphasis added). In *Brooks*, the agreement likewise provided: "If any ... claim arises out of or relat[es] to this Agreement, the Parties agree first to try in good faith to settle the dispute by non-binding mediation ***before resorting to ... litigation***." *Brooks,* 2015 WL 5178080, at *5 (alterations in original; emphasis added). Similarly, in *Delamater*, the language at issue was explicit: "We each agree to enter into mediation of all disputes involving this Agreement ... ***prior to initiating any legal action or arbitration against the other.***" 722 F.Supp.2d at 1177. Finally, in *Centaur* the cascading mediation provision established that the parties "will attempt to settle any claim or controversy arising out of the Agreement.... then the dispute will be mediated by a mutually acceptable mediator...." and the dispute "***may then be submitted to the courts within Arizona for resolution.***" *Centaur*, 2010 WL 444715, at *1–2 (S.D. Cal. Feb. 2, 2010); *see also Del Rey Fuel, LLC v. Bellingham Marine Indus.,* No. CV 12–01008, 2012 WL 12941956, at *4 (C.D. Cal. Apr. 10, 2012) (mediation clause stated: "Any Claims arising out of or related to the Contract, ... shall ... be subject to mediation ***as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party.***" (emphasis added)).

*Franke,* 2019 WL 4856002, at *6 (emphasis in original). In holding that mediation was not a condition precedent to litigation, the court reasoned that the mediation clause at issue did not "even mention the concept of litigation, much less unambiguously provide that mediation is a condition that a party must satisfy *before* filing a lawsuit." *Id.*

The *Franke* court's logic regarding a mediation clause applies with equal force to the dispute resolution clause at issue in Section 3(h) of the Employment Agreement. Like the clause in *Franke,* Section 3(h) does not "even mention the concept of litigation[.]" *Id.* *National Biodiesel* is not contrary, as the dispute resolution clause at issue in that case contained language that the parties could only "seek redress in a court" after

12

exhausting the dispute resolution process laid out in the contract. *National Biodiesel,* 2019 WL 8376265, at *8. As such, I find that Section 3(h)'s failure to mention the concept of litigation indicates that the parties did not intend the dispute resolution process to serve as a condition precedent to filing a lawsuit.

The next issue is the effect of each party's allegations of the other party's material breach and failure to perform. O'Holleran contends that because UPC materially breached the contract, he was discharged from his duties under Section 3(h), while UPC contends that O'Holleran did not perform his obligations under Section 3(h) and thus is precluded from advancing his breach of contract claim. Doc. 17-1 at 6; Doc. 15-1 at 8-10. "Generally, questions of performance or breach are for the jury." *Iowa-Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993). "Under Iowa law, a breach must be material before it becomes a valid basis for unilateral termination of the contract by the non-breaching party, and materiality is an issue of fact for the jury." *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1239 (8th Cir. 1987) [citations omitted].

Beginning with O'Holleran's argument that he was discharged from his contractual duties due to UPC's alleged material breach, the Iowa Supreme Court's decision in *Dolly Investments, LLC v. MMG Sioux City, LLC,* 984 N.W.2d 168 (Iowa 2023), provides helpful context. In that case, the Court discussed a non-breaching party's contractual obligation, as follows:

> If a lease agreement specifies the consequences of a material breach, the agreement's terms will be followed. However, when a lease is silent on the matter, Restatement (Second) section 242 will apply. Section 242 provides that a material breach does not automatically discharge the injured party's obligation to perform under the contract. Rather, a material breach temporarily suspends the injured party's duty to perform. Then, if the materially breaching party does not cure, the injured party's duty is discharged. In other words, "a party's uncured material failure to perform … has the effect of suspending the other party's duties" to perform. Then when it is too late for the first party to perform, the injured party's duty to perform is finally discharged. Section 242 sets out three factors to guide

13

courts in determining when the period of suspension ends and the injured party's obligations are discharged.

There appears to be some confusion on this point, probably due to pronouncements in caselaw "that once one party to a contract breaches the agreement, the other party is no longer obligated to continue performing his or her own contractual obligations." Material breaches do often result in a discharge of the injured party's contract duties. But not always. Again, district courts should first apply relevant lease provisions that provide specific consequences for a material breach. In the absence of such provisions, the courts should apply Restatement (Second) section 242.

*Id.* at 177 (internal citations omitted). In that case, Dolly Investments entered into a commercial real estate lease with MMG. *Id.* at 171. Article 13.1 of the lease explicitly governed late or missed rent payments, stating that in the event of a missed payment, "the landlord was obligated to send written notice to cure the breach within fifteen days. After that time, the tenant's failure to cure would constitute a 'default.'" *Id.* After a series of missed payments by MMG, Dolly Investments sent notice for MMG to cure within 15 days pursuant to Article 13.1. *Id.* at 172. After the 15-day period elapsed, Dolly Investments unilaterally terminated the lease. *Id.*

In discussing the parties' obligations to one another after the nonpayment of rent, the Court determined that while nonpayment was a breach, it did not become a material breach until the 15-day period provided in the contract had elapsed. *Id.* at 175. Importantly, the court interpreted the 15-day cure window to mean that the parties did not intend for the non-payment of rent to immediately discharge Dolly Investment's duties as landlord because the lease specifically designated a process to follow in the event of nonpayment. *Id.* The Court then inferred from the language of the contract that nonpayment would rise to the level of material breach after MMG failed to cure the nonpayment in the fifteen-day window, stating, "[b]ecause the lease agreement defines default and material breach in this way, we need not analyze whether a default is a material breach under the Restatement (Second)." *Id.*

14

UPC argues that *Dolly Investments* "undermines O'Holleran's theory that he was excused from complying with Section 3(h)'s dispute-resolution procedure." Doc. 19 at 5. UPC reasons that "[e]ven if UPC had materially breached the Employment Agreement by infringing on O'Holleran's independent medical judgment … this would only have suspended O'Holleran's contractual obligations while he sought to resolve the dispute through Section 3(h)'s procedure." *Id.* *Dolly Investments* is distinguishable in one important respect. In that case, the Court inferred that a breach became material after the 15-day window to cure because the lease provided that "the uncured failure to pay rent triggers the landlord's right to expel the tenant and either terminate the lease or relet the property without terminating the lease. Consequently, default on this lease gives rise to the types of remedies that contract law traditionally attributes to material breaches." 984 N.W 2d at 175.

By contrast, Section 3(h) does not present language indicating that a party's contractual duties would be suspended while they utilized the dispute resolution measures, after which a breach could become material because failure to cure resulted in "the types of remedies that contract law traditionally attributes to material breaches." *Id*. Instead, Section 3(h) merely states that the Regional Physician Leadership Council may "investigate complaints by Physician and make findings and recommendations to the Regional Physician Leader within its area of responsibility." Doc. 15-2 at 3 ¶ 12. This language does not imply that traditional material breach remedies flow from raising a complaint to the Regional Physician Leadership Council, but rather states vaguely that findings and recommendations may be issued after raising a complaint to the council. *Id*.

The Employment Agreement's silence as to what constitutes a material breach means that before I may determine the issue of whether O'Holleran's contractual duties were discharged, I must consider whether a jury could reasonably find that a material breach occurred based on the factors set forth in Restatement (Second) of Contracts § 241. *See Dolly Investments,* 984 N.W.2d at 174. The Restatement

15

looks to the injured party and asks to what extent that party will be deprived of the benefit it reasonably expected, account being taken of the possibility of adequate compensation for that part. It also looks to the other party—to the possibility that it will suffer forfeiture, to the likelihood that it will cure its failure, and to the degree that its behavior comported with standards of good faith and fair dealing. Most significant is the extent to which the breach will deprive the injured party of the benefit that it justifiably expected.

*Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.,* 599 N.W.2d 684, 692 (Iowa 1999) (quoting E. Allan Farnsworth, Farnsworth on Contracts § 8.16, at 496–97 (2d ed.1998) (citing Restatement (Second) of Contracts § 241)). If a jury could find that a material breach occurred, I must then determine whether a jury could find that this material breach discharged O'Holleran's contract duties under Section 242 of the Restatement (Second) of Contracts. *Dolly,* 984 N.W.2d at 174. "One of section 242's relevant circumstances is the five materiality factors from section 241. In this way, section 242 incorporates and adds to the substance of section 241." *Id.* (internal citation omitted).

Viewing the evidence in the light most favorable to O'Holleran, I find that there are genuine issues of material fact as to whether UPC materially breached the Employment Agreement. Beginning with the most important factor, the extent to which the breach deprived O'Holleran of a benefit he reasonably expected, Section 3(h) states:

Foundation shall not have, exercise, or attempt to exercise any control over the professional judgment and decision making of Physician. Physician is free to accept and treat patients according to his or her best medical judgment, or to transfer such patients for diagnosis or cure to other practitioners or facilities in accordance with the patient's best medical interest, so long as the action of Physician is not based upon a prohibited reason enumerated in Section 3(d) above.

Doc. 15-2 at 3 ¶ 12. There are sufficient facts in the record for a jury to find that control over his independent medical judgment was a benefit O'Holleran reasonably expected and that he was deprived of that benefit. For example, O'Holleran testified that he was

concerned about having independent medical judgment as part of his practice but was reassured by Section 3(h) of the Employment Agreement. Doc. 17-2 at 15. He further testified that his independent medical judgment was compromised on numerous occasions, with his superiors interfering with his decisions to recommend elective surgeries rather than immediate operations, not to place dialysis catheters and to review CAT scans with patients. *Id.* at 15-20.

The likelihood that UPC would cure its failure also presents an issue for the jury. *Van Oort,* 599 N.W.2d at 692. While UPC argues that Section 3(h)'s dispute resolution procedures provided O'Holleran a mechanism to cure the alleged breach, a jury could find that any potential relief from Section 3(h) was illusory given its vague nature and the evidence that UPC may have actively been looking to replace O'Holleran throughout his employment. Doc. 17-2 at 7, 30. This alleged desire to replace O'Holleran could also support a finding that UPC did not act in good faith. In short, there are genuine issues of material fact on the issue of breach and materiality.

As noted above, the analysis does not end here. I must determine whether a jury could find that UPC's alleged material breach discharged O'Holleran's duties under the contract, rather than merely suspending them, thus allowing O'Holleran to unilaterally terminate the Employment Agreement. *Ryko,* 823 F. 2d at 1239; *Dolly Investments,* 984 N.W.2d at 174. Restatement (Second) of Contracts § 242 states:

> In determining the time after which a party's uncured material failure to render or to offer performance discharges the other party's remaining duties to render performance under the rules stated in §§ 237 and 238, the following circumstances are significant:
>
> (a) those stated in § 241;
>
> (b) the extent to which it reasonably appears to the injured party that delay may prevent or hinder him in making reasonable substitute arrangements;
>
> (c) the extent to which the agreement provides for performance without delay, but a material failure to perform

17

> or to offer to perform on a stated day does not of itself discharge the other party's remaining duties unless the circumstances, including the language of the agreement, indicate that performance or an offer to perform by that day is important.

Restatement (Second) of Contracts § 242. The commentary to Section 242 states:

> Ordinarily there is some period of time between suspension and discharge, and during this period a party may cure his failure. Even then, since any breach gives rise to a claim, a party who has cured a material breach has still committed a breach, by his delay, for which he is liable in damages.

Restatement (Second) of Contracts § 242 cmt. a, (1981).

Applying the § 241 factors in the context of § 242, a jury could reasonably find that these factors weigh in favor of a finding that UPC's alleged material breach discharged O'Holleran's duty to perform. As summarized above, a jury could find that O'Holleran was deprived of the benefit of exercising his independent medical judgment and that this was a reasonably expected benefit. A jury could also find that UPC's conduct in searching for a replacement, and placing O'Holleran on multiple PIPs, demonstrates that UPC was unlikely to cure its breach, even taking Section 3(h)'s dispute resolution procedures into account.[3] Doc. 17-2 at 6-8. As noted above, those factors could also result in a finding that UPC did not act in good faith.

---

[3] The parties disagree about the extent to which O'Holleran utilized any of Section 3(h)'s dispute resolution measures. O'Holleran claims that he "met on numerous occasions with the administrative staff who are the top decision makers within [UPC's] Sioux City Location" and thus satisfied Section 3(h)'s requirements. Doc. 17 at 2. UPC argues that "regardless of whether O'Holleran initiated the first mandatory step of Section 3(h)'s dispute resolution process, he certainly did not satisfy the second mandatory step by raising the dispute to the Regional Physician Leadership Council." Doc. 15-1 at 10. Section 3(h) is vague about how to raise the issue of interference with independent medical judgment with the Regional Physician Leadership Council, as required to satisfy the second step of Section 3(h)'s dispute resolution procedures. Viewing the evidence in the light most favorable to O'Holleran as the non-moving party, a jury could reasonably find that O'Holleran's continuous communication with Pallone, a member of the Regional Physician Leadership Council, satisfied Section 3(h)'s dispute resolution process. While Pallone stated in his affidavit that O'Holleran did not raise the issue with the Regional Physician Leadership Council, Section 3(h)'s vagueness about how to raise an issue means that

As to the second § 242 factor, a jury could find that a delay would have prevented or hindered O'Holleran in making reasonable substitute arrangements. As he testified, he was placed on multiple PIPs, which were the final step before termination. Doc. 17-2 at 7, 17. His affidavit states that being fired at his age would function as essentially a scarlet letter for his career. *Id.* at 8. Given that there were no assurances about keeping his job even if he utilized Section 3(h), a jury could find that the resultant delay in pursuing that route would have harmed O'Holleran. As such, this factor could support a finding that O'Holleran's duties under the Employment Agreement were discharged.

Finally, a jury could find that the third § 242 factor, the extent to which the agreement provides for performance without delay, weighs in favor of O'Holleran's duties being discharged. *See* Restatement (Second) of Contracts § 242(c). O'Holleran testified that being able to assess patients using his independent medical judgment is an important aspect of providing adequate patient care. Doc. 17-2 at 16-17. It is feasible that any delays in the ability to provide such care could cause harm to patients. Viewing the record in the light most favorable to O'Holleran, this factor weighs in favor of a finding that O'Holleran was discharged from his duties under the Employment Agreement.

After considering the relevant §§ 241 and 242 factors, I find that a jury could reasonably find that O'Holleran's duties under the Employment Agreement were discharged due to UPC's alleged material breach by interfering with his independent medical judgment. As such, UPC's motion for summary judgment will be denied with respect to O'Holleran's breach of contract claim.

---

a jury could find that O'Holleran did raise the issue with Pallone through these conversations, as described in his own affidavit. Doc. 15-3 at 22; Doc. 17-2 at 6-7 (O'Holleran describing his PIP meetings with Pallone). Further, even if a jury finds that O'Holleran did not progress to step two of the dispute resolution procedure, a jury could also infer from the surrounding circumstances, such as the multiple PIPs, that O'Holleran would not obtain relief from Section 3(h), thus weighing in favor of a finding of his duties being discharged under Restatement Section 242(b).

19

## C.  UPC's Counterclaim

UPC alleges that O'Holleran breached the Employment Agreement by (1) refusing to repay the signing bonus and relocation expenses and (2) by publicly filing the entire unredacted Employment Agreement.  Doc. 15-1 at 13.  Both theories will depend on the jury's findings as to material breach, performance and discharge.[4]  While it is undisputed that the Employment Agreement contained claw back provisions for the signing bonus and relocation expenses, as well as a confidentiality provision,  I have determined that a

---

[4] UPC argues that O'Holleran did not plead any affirmative defenses and is thus precluded from raising a "prior material breach" affirmative defense.  Doc. 15-1 at 13 n. 4.  As the Eighth Circuit has explained:

> The Supreme Court has indicated that the Rule 8(c) pleading requirement is intended to give the opposing party both notice of the affirmative defense and an opportunity to rebut it. *Grant v. Preferred Research, Inc.,* 885 F.2d 795, 797–98 (11th Cir.1989) (citing *Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.,* 402 U.S. 313, 350, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971)). We have, therefore, eschewed a literal interpretation of the Rule that places form over substance, *Thomas v. St. Luke's Health Sys., Inc.,* 869 F. Supp. 1413, 1428–29 (N.D. Iowa, 1994), aff'd per curiam, 61 F.3d 908 (8th Cir.1995) (unpublished table decision), and instead have held that "[w]hen an affirmative defense 'is raised in the trial court in a manner that does not result in unfair surprise, … technical failure to comply with Rule 8(c) is not fatal.'" *Financial Timing Publ'ns, Inc. v. Compugraphic Corp.,* 893 F.2d 936, 944 n. 9 (8th Cir.1990) (quoting *Allied Chem. Corp. v. Mackay,* 695 F.2d 854, 855 (5th Cir. 1983)).

*First Union Nat. Bank v. Pictet Overseas Trust Corp., Ltd.,* 477 F.3d 616, 622 (8th Cir. 2007); *see also Scott v. City of Sioux City, Iowa,* 23 F. Supp. 3d 1017, 1021-22 (N.D. Iowa 2014) ("Generally, affirmative defenses need not be plead with the same level of specificity that Rule 12(b)(6) requires with regard to a plaintiff's causes of action."). While O'Holleran's answer to UPC's counterclaim does not include a section entitled "affirmative defenses," it makes allegations about UPC's alleged prior breach of contract three times and generally asserts that the counterclaims should "be dismissed due to the breach by Defendants[.]"  Doc. 12.  This sufficiently put UPC on notice that O'Holleran would be relying on a prior material breach defense and allowing him to proceed with that defense does not result in unfair surprise.  Indeed, UPC was clearly not surprised by this defense, as it briefed the issue in its motion for summary judgment.  Doc. 15-1 at 13-14.

jury could reasonably find that UPC materially breached the Employment Agreement and that this material breach discharged O'Holleran's contractual duties. As such, UPC is not entitled to summary judgment on its breach of contract counterclaim.

## VI.    CONCLUSION

For the reasons set forth herein:

1.    UPC's motion (Doc. 15) for summary judgment is **granted in part and denied in part**. It is **granted** as to O'Holleran's negligent misrepresentation claim (Count II), which is dismissed. It is **denied** as to O'Holleran's breach of contract claim (Count III) and UPC's counterclaim for breach of contract.

2.    This case will proceed to a jury trial as to O'Holleran's breach of contract claim and UPC's counterclaim.


**IT IS SO ORDERED** this 21st day of May, 2025.


_____
Leonard T. Strand
United States District Judge